**Glen WILGUS et al., Plaintiffs,**

v.

**Russell W. PETERSON, individually and as Governor of the State of Delaware, et al., Defendants.**

**Civ. A. No. 4263.**

United States District Court,
D. Delaware.

Jan. 5, 1972.

Ernest S. Wilson, Jr., Sheldon N. Sandler, John S. Grady and David A. Leen, Wilmington, Del., for plaintiffs.

Rodman Ward, Jr., and Robert G. Carey, Wilmington, Del., Special Counsel to defendants.

FINDINGS OF FACT AND CONCLU-SIONS OF LAW RELATING TO AN APPLICATION FOR A PRO-TECTIVE ORDER

STAPLETON, District Judge.

This is a civil action brought by six inmates at the Delaware Correctional Center under the Civil Rights Act.

42 U.S.C. §§ 1983(3), 1985(3) and 1986; 28 U.S.C. § 1343(3) and (4). It is presently before me on a motion of the plaintiffs for a "protective order" enjoining "defendants and their agents from confiscating or tampering with legal files maintained by individual plaintiffs containing communications from counsel and pleadings herein, and in other actions."

### FINDINGS OF FACT

1. Plaintiff Glen Wilgus is incarcerated in the Delaware Correctional Center serving a sentence imposed by the Superior Court of the State of Delaware. He is confined in the maximum security section of that institution.

2. Prior to September 2, 1971, Wilgus had in his cell in Block B a substantial number of books and papers, some of which related to various legal proceedings in which he was involved. The books and some of the papers were kept in two cardboard boxes in his cell. The remaining papers were locked in a drawer attached to his bed.

3. On September 2, 1971, there was a riot in the maximum security section of the prison. During the course of that riot substantial property damage was done in the common areas of this section. Conditions in these areas at the time were chaotic. Glass, linens, books and other debris were strewn over the floors. It took five staff members and a number of inmate volunteers approximately two days to clean out this debris.

4. No substantial damage was done during the riot to the personal property of inmates located in their cells.

5. After order was restored, Wilgus was transferred from his cell to administrative isolation. Subsequently he was transferred to the hospital. Approximately three weeks after the riot he was transferred to a cell in Block C of the maximum security section.

6. At some time shortly after Wilgus was transferred to administrative isolation, his personal belongings were taken from the cell and at least a substantial portion of them were placed in two large paper garbage bags, each of which was more than half filled. A watch and bracelet were delivered to the officer in charge of the section. These actions were standard procedure upon the transfer of an inmate from his cell to administrative isolation.

7. The two bags containing personal belongings of Wilgus, along with bags containing personal belongings of approximately fifteen other inmates similarly transferred, were placed in a closet off the hobby room. This closet was locked. Lt. Tucker, the cook, and their night shift counterparts had keys to the closet. The door had a small, approximately 6″ x 8″ window located a little below eye level for the average person. It had been broken in the riot. Jagged glass was still around the perimeter.

8. During the period prior to Wilgus' transfer to Cell Block C, Lt. Tucker, who was in charge of maximum security at the time, went into the closet three or four times in order to return the personal belongings of other inmates who had been transferred back. On each of these occasions he saw the two bags containing Wilgus' belongings, each of which was a little over half filled.

9. When Wilgus was transferred to Cell Block C he asked for the return of his personal belongings. His watch and bracelet were returned to him from Lt. Tucker's desk. He was taken to the closet to get his other belongings. At this time one bag was about half filled and the other bag only had sufficient contents to cover its bottom. The floor, however, was strewn with paper.

10. The personal property of Wilgus returned to him at this point was less than all of the personal property which he had prior to September 2, 1971. Among the missing property were a number of books and some papers relating to various legal proceedings in which Wilgus had been involved.

11. The missing property has not been returned to Wilgus since that time.

12. After these episodes, Lt. Tucker provided Wilgus with a lock for the

drawer in his cell. He gave Wilgus the only key to this lock.

13. The present action was filed on November 3, 1971. Since that time Wilgus has maintained a file relating to this action. This file contains copies of record papers as well as correspondence to and from counsel.

14. Wilgus fears that his file regarding this case will be confiscated or "tampered with" unless the requested protective order is granted. This fear is based upon the above related episodes and his belief that his papers have been rearranged in his absence on several occasions since his return to Cell Block C.

15. Wilgus is a "writ writer." He has filed numerous court petitions on his own behalf and on behalf of other inmates.

16. Under the prison regulations inmates are entitled to keep legal papers in their cells. They are limited under these regulations to three law books at any one time, but this regulation is not generally enforced. There are no prison regulations which restrict the activity, or are designed to discourage the practice of "writ writing."

17. It has not been shown that any of the named defendants have directed that Wilgus' personal belongings be confiscated or tampered with. Superintendent Anderson and Lt. Tucker, the two officials who testified, have not given such a directive and have no knowledge of such a directive being given. Except as hereafter noted with respect to Superintendent Anderson, it has not been shown that any of the named defendants have heretofore had knowledge of any confiscation or tampering with Wilgus' papers. Superintendent Anderson and Lt. Tucker had knowledge prior to the present application of Wilgus' claim that not all of his property was returned following his transfer to Block C. There is no evidence that these two officers were previously aware of Wilgus' claim of subsequent tampering and, assuming as I do that Wilgus' hearing testimony is their sole source of present knowledge, they still have no knowledge of times and dates or other specific facts underlying this claim.

18. It is the policy and practice of the prison administration to permit the accumulation and retention by inmates of legal papers and a reasonable effort is made to keep inmates' personal belongings secured to the inmates. These efforts were not entirely successful insofar as Wilgus' property was concerned during the several week period following September 2, 1971.

19. It is impossible to determine from the present record what happened to Wilgus' missing personal property. The following, however, can be said:

(a) It is more probable than not that Wilgus' missing personal property was not lost or destroyed during the September 2, 1971 riot.

(b) It is more probable than not that the missing property was not taken by other inmates.

(c) It is as likely that the missing personal property was discarded without wrongful intent during the course of the cleanup following the riot as it is that this property was confiscated by prison guards at that time or thereafter.

20. If there has been tampering with Wilgus' file since his return to Block C, it has not been demonstrated to be part of a general practice of which the named defendants knew or should have had notice.

21. Members of the prison staff have access to Wilgus' cell but not to the drawer in his bed in Cell Block C.

## CONCLUSIONS OF LAW

1. This Court has ancillary jurisdiction to entertain the present application to the extent it pertains to attorney-client communications in this action. Accepting the plaintiffs' factual contentions as true for the purpose of ascertaining jurisdiction, I conclude that the present application satisfies the criteria heretofore established for the exercise of such ancillary jurisdiction. These criteria were recently discussed by the

United States Court of Appeals for the District of Columbia in Morrow v. District of Columbia, 135 U.S.App.D.C. 160, 417 F.2d 728, 740 (1969):

. . . The major purpose of ancillary jurisdiction, as seen from the cases cited above, is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party's actions, either directly or indirectly, threaten to compromise the effect of the court's judgment. This purpose is joined by another, mentioned in Section A, *supra,* that of judicial economy; disputes related to a single dispute should be resolved in the original forum. . . .

To effectuate these purposes, and yet confine a court to proper bounds consistent with the past use of ancillary jurisdiction as discussed above, we believe that, in a situation such as the one before us, ancillary jurisdiction should attach where: (1) the ancillary matter arises from the same transaction which was the basis of the main proceeding, or arises during the course of the main matter, or is an integral part of the main matter; (2) the ancillary matter can be determined without a substantial new fact-finding proceeding; (3) determination of the ancillary matter through an ancillary order would not deprive a party of a substantial procedural or substantive right; and (4) the ancillary matter must be settled to protect the integrity of the main proceeding or to insure that the disposition in the main proceeding will not be frustrated.

See also Shepherd v. Maxwell, 384 U.S. 333, 361, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

■ 2. While the present application is cast in the form of a motion for a protective order, in legal effect it seeks relief by way of injunction. The application is, accordingly, to be judged by the rules governing the issuance of injunctions.

■ 3. In an appropriate case, a federal court may enter an injunction against individual state officials under the Civil Rights Act without running afoul of the Eleventh Amendment or the established doctrine that a state is not a "person" within the meaning of the Civil Rights Act. *E. g.,* Shellburne, Inc. v. New Castle County, 293 F.Supp. 237, 244 (D.Del.1968).

4. The defendants in this action are Russell W. Peterson, Albert L. Ingram, John J. Moran, Harry W. Towers and Raymond W. Anderson. Raymond W. Anderson is the Superintendent of the Delaware Correctional Center and the other defendants are his superiors who have responsibilities in the area of corrections. Russell W. Peterson is the Governor of the State of Delaware.

5. The agents and employees of the named defendants are not parties to this action. The caption in this case names the individual defendants and then, without further specificity, states "and other Agents and employees of named Defendants". The text of the complaint makes no effort to allege facts which would entitle the plaintiffs to proceed against a class of defendants under Rule 23.[1] The only relief sought against anyone other than the named defendants is cast in the form of a prayer for an injunction restraining "defendants and their agents and employees" from specified activities.

■■ 6. In an injunction context, a court exercises *in personam* jurisdiction. Before a court can place a person in a position where he is subject to contempt citation, that person has a right to be heard. For this reason, injunctions are binding only on parties and their privies and, to the extent they purport to bind others, they are void. Swetland v. Curry, 188 F.2d 841 (6th Cir. 1951); Alemite Manufacturing Corp. v. Staff, 42 F. 2d 832 (2nd Cir. 1930); Wright v.

---

1. I do not pass upon whether the plaintiffs might be entitled to maintain this action against a class of defendants.

County School Board, 309 F.Supp. 671 (E.D.Va.1970).

7. Rules 65(d) of the Federal Rules of Civil Procedure, 28 U.S.C. provides as follows:

> Every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

The Supreme Court of the United States explained the purpose of the clause relating to "officers, agents, servants, employees, etc." in Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 14, 65 S. Ct. 478, 481, 89 L.Ed. 661 (1945):

> . . . [Rule 65(d)] is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. *In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.* (Emphasis supplied.)

■ Rule 65(d), accordingly, is designed to extend the operation of the court's order to those acting in concert with a defendant who is being enjoined. The rule does not mean that agents may be enjoined where there is no showing that plaintiffs are entitled to injunctive relief against principals. Plaintiffs are not entitled to injunctive relief against agents in such a situation. Eighth Regional War Labor Board v. Humble Oil & Refining Co., 145 F.2d 462 (5th Cir. 1945).

■ 8. Except to the extent defendants in this action have been shown, either by way of action or inaction, to have personally violated a right secured to plaintiffs by the United States Constitution, they are not responsible to the plaintiffs under the Civil Rights Act.

While the application of this principle may be somewhat different in an action for injunctive relief than in an action for damages, I do not believe that injunctive relief against a public official is appropriate based solely on the isolated actions of subordinates where there is no showing that the official has participated in the wrongful conduct or has knowingly ignored that conduct when he had the duty and the practical ability to terminate it. Compare Campbell v. Anderson, 335 F.Supp. 483 (D.Del. opinion filed December 28, 1971); Bennett v. Gravelle, 323 F.Supp. 203, 214–215 (D. Md.1971); Dunham v. Crosby, 435 F.2d 1177 (1st Cir. 1970); with Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969); Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966); Inmates of Attica Correctional Facility et al., v. Rockefeller, 453 F.2d 12 (2nd Cir. 1971). Indeed, in the absence of such a showing, the entry of an injunction would ordinarily be a wholly pointless act unless it be cast in terms which make the public official the insurer, in legal effect, of the plaintiffs' constitutional rights. I have found no case suggesting that a public official should be compelled to shoulder such a burden on pain of contempt without any showing of prior wrongdoing on his part.

■ 9. In the instant case the evidence of prior confiscation and tampering was limited to facts from which one could, at best, infer isolated instances of interference with the belongings of a single inmate by an unknown guard or guards. It was not the execution of a plan or practice sponsored or condoned by the defendants. It has not been shown that the defendants have interfered, or will hereafter interfere, with plaintiffs legal files or that they have failed, or will hereafter fail, to use reasonable efforts to prevent such interference by others. In short, there has been no threat demonstrated which an order restraining defendants and those acting in concert with them would tend to remedy.

10. Plaintiffs have made no showing entitling them to injunctive relief against the defendants in this action.

11. I conclude that basic fairness to the defendants as well as to the prison staff, the state police, the staff of the state courts and the other agents of the named defendants who may come in contact with the plaintiffs dictates a denial of plaintiffs' application. The factual situation developed at the hearing on the present application, however, does give cause for concern. While I am not convinced that a member of the prison staff has tampered with Wilgus' legal papers, I am not convinced to the contrary. I do believe, however, that the prison administration has and will make every reasonable effort to see that the plaintiffs' attorney-client privilege is respected. This, combined with reasonable self-help efforts on the part of plaintiffs should go a long way toward solving any problem that may exist.[2]

2. Plaintiff Wilgus has now been provided with a secure spot to keep those portions of his legal papers containing privileged information. I assume that upon a showing of comparable circumstances similar consideration will be given to the remaining plaintiffs. I do not hold, however, that such is necessary for all inmates under all circumstances.