763 F.2d 711
 54 USLW 2013
 Friedrich Wilhelm WAFFENSCHMIDT, et al.,
Plaintiffs-Appellees-Appellants Cross-Appellees,
v.
Jack W. MACKAY, Jr., et al., Defendants,
Palmore Currey, II, et al., Appellants Cross-Appellees,
First National Bank of Mount Vernon, Texas, Appellee
Cross-Appellant Cross-Appellee.
 No. 84-4012.
 United States Court of Appeals,
Fifth Circuit.
 June 21, 1985.
 
 J. Robertshaw, Robertshaw & Meredith, Greenville, Miss., for Currey.
 Phillip N. Cockrell, Texarkana, Tex., for First Nat. Bk. of Mt. Vernon.
 Schwartz, Klink & Schreiber, James Schreiber, Stephen C. Edds, New York City, for Waffenschmidt.
 W. Wayne Drinkwater, Lake, Tindall, Hunger & Thackston, Greenville, Miss., for First Nat. Bank.
 Appeals from the United States District Court for the Northern District of Mississippi
 Before CLARK, Chief Judge, GARWOOD, and HILL, Circuit Judges.
 CLARK, Chief Judge:
 
 
 1
 * Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum. We, therefore, affirm the judgment of the district court, holding that three of the respondents, D & K Motor Sports, Inc. ("D & K"), its owner, Johnson (collectively referred to as "Johnson"), and Currey were in contempt of court. We affirm the holding that a fourth respondent, the First National Bank of Mount Vernon, Texas ("the Bank"), did not aid or abet the defendant. We also affirm the court's rulings concerning attorney's fees and pretermit any ruling on the order permitting substitution of collateral for Johnson's supersedeas bond.
 
 II
 
 2
 This appeal is the culmination of a series of proceedings directed toward halting the dissipation and secretion of assets that are the subject of the underlying suit. For the purposes of this appeal, to the extent that these facts relate to the events between MacKay and the Waffenschmidts, which are the subject of ongoing proceedings in the district court, we will assume as true the facts as stated in the Waffenschmidts' complaint. To the extent these facts relate to the district court's findings concerning the appellants, Currey, Johnson, and the Bank, we construe the evidence in a light most favorable to upholding the court's verdict. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 
 
 3
 The Waffenschmidts paid MacKay $4.5 million for stock in a Mississippi corporation and subsequently sued him for securities fraud. The court issued a temporary restraining order (TRO) on March 16, 1983, which enjoined MacKay and "all persons acting in concert" with him from:
 
 
 4
 [t]ransferring, concealing, or disposing of any funds received by them from [the Waffenschmidts], or any property acquired with such proceeds ... [or] permitting the concealment, transfer, disposal, secreting, dissipation, or encumbering of such assets; provided, however, that this order shall not preclude [those subject to this order] ... from carrying on or engaging in the usual and ordinary conduct of business....
 
 
 5
 The court extended the TRO through May 24, 1983. On May 27, after a three day hearing, the court granted a preliminary injunction which continued the interdictions of the TRO and also required MacKay to pay $430,000 of the proceeds from the stock sale into the court.
 
 
 6
 MacKay was unable to deposit these funds with the court because he had transferred them in the form of United States Treasury Notes with attached interest coupons to Currey ($103,500), Johnson ($100,000), and the Bank ($230,000) during the spring of 1983. These respondents independently received the proceeds in Texas sometime between March and June.
 
 
 7
 The court commenced a hearing on July 23, requiring MacKay to show cause why he should not be held in contempt. During the course of this hearing, plaintiffs deposed Currey, Johnson, and the Bank's president, Greer. The court found MacKay guilty of civil contempt and ordered him jailed on August 22 until he complied with the court's order. MacKay remained in jail until November 10, at which time the court released him on the ground that further incarceration would be punitive.
 
 
 8
 Meanwhile, the Waffenschmidts had attempted to retrieve these funds from Currey, Johnson, and the Bank. On March 21, 1983, plaintiffs served the Bank with a copy of the TRO, and on March 25 with notice of its extension. The Bank received a copy of the preliminary injunction on July 25. Currey and Johnson received copies of the TRO and preliminary injunction shortly after their depositions in July. The Waffenschmidts sent each respondent a copy of the Order of Contempt against MacKay by September 2.
 
 
 9
 Following the release of MacKay, the court issued an order on November 14 to Currey, Johnson, and the Bank to show cause why they were not in contempt. The court also ordered them to turn over the proceeds they had received from MacKay. These respondents moved to quash the order, alleging lack of jurisdiction among their defenses.
 
 
 10
 The court held a hearing on December 2, and Currey, Johnson, and the Bank entered special appearances to contest the court's jurisdiction. MacKay, Currey, Johnson, and Greer testified and had full opportunity to present evidence to support their positions. The court found that none of these respondents had contacts within Mississippi to subject them to traditional in personam jurisdiction. It found, however, that Currey and Johnson had notice of the court's orders, acted as agents, servants, and/or employees of MacKay, and acted in active concert and participation with him in dissipating the stock proceeds.
 
 
 11
 The court thus held that they were subject to the court's jurisdiction as persons enjoined by the court's order. Upon evaluating all the evidence presented at the hearing, the court found Currey and Johnson in contempt and imposed compensatory fines on Currey for $110,340.09 and on Johnson for $106,840.09. These amounts included a $6,840.09 award of attorney's fees against each.
 
 
 12
 In contrast, the court found that while the Bank had received notice of the TRO and acted negligently in its transactions with MacKay, it had not acted as MacKay's agent in active concert or participation with him. Therefore, the court held it lacked jurisdiction over the Bank, and could not hold it in contempt. The court declined to award either the Bank or the Waffenschmidts attorney's fees against the other party.
 
 
 13
 Currey and Johnson filed timely notice of appeal. The Waffenschmidts cross-appealed, seeking a civil contempt order and attorney's fees against the Bank. The Bank also cross appealed, petitioning for attorney's fees against the Waffenschmidts. Finally, upon application of Johnson, the court allowed him to pledge approximately $31,000 worth of boats, motors, and trailers to serve as security pending this appeal, in place of the traditional supersedeas bond for the full $106,840.09. The Waffenschmidts also appeal this substitution.
 
 III
 
 14
 Currey, Johnson, and the Bank assert that the District Court for the Northern District of Mississippi lacks jurisdiction to hold these Texas residents in contempt of court. The court held that the respondents lacked sufficient contacts to exercise traditional in personam jurisdiction over them. None were named as parties in the underlying suit or had any contacts with Mississippi, and all lived beyond the territorial limits for service of process as prescribed in Fed.R.Civ.P. 4(f).
 
 
 15
 Currey and Johnson contend that the court's action in holding them in contempt violates International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), requiring that before a court may assert jurisdiction over a person, the person must have sufficient minimum contacts with the forum such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " Id. at 316, 66 S.Ct. at 158, quoting, Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940).
 
 
 16
 The district court evaluated jurisdiction of Currey, Johnson, and the Bank pursuant to Fed.R.Civ.P. 65(d), which states in pertinent part:
 
 
 17
 Every order granting an injunction and every restraining order ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.
 
 
 18
 We must determine whether knowing violation of a court's injunction order by the agent of a party who aids and abets that party's violation of the order permits jurisdiction when no other contacts exist with the forum. We conclude that such jurisdiction is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process.
 
 
 19
 * At the outset of our analysis, we note that the court exercised two types of jurisdiction. Only the second type is contested in this appeal.
 
 
 20
 Initially, the court asserted jurisdiction to determine whether it had personal jurisdiction of the parties. The power of a court to exercise this preliminary jurisdiction is well settled, and respondents do not dispute that the court had such authority. See United States v. United Mine Workers, 330 U.S. 258, 293, 67 S.Ct. 667, 695-96, 91 L.Ed. 884 (1947); Familia de Boom v. Arosa Mercantil, S.A., 629 F.2d 1134, 1137 (5th Cir.1980); Atlantic Las Olas, Inc. v. Joyner, 466 F.2d 496, 498 (5th Cir.1972); 13 Wright, Miller & Cooper, Federal Practice and Procedure, Jurisdiction 2d, Sec. 3536 (1984). Instead, they attack the court's determination that it had personal jurisdiction of respondents so as to properly hold Currey and Johnson in contempt. This latter finding is the subject of our further analysis.
 
 B
 
 21
 Courts possess the inherent authority to enforce their own injunctive decrees. United States v. Hall, 472 F.2d 261, 267 (5th Cir.1972) ("Rule 65(d) as a codification rather than a limitation of courts' common-law powers, cannot be read to restrict the inherent power of a court to protect its ability to render a binding judgment."); Berry v. Midtown Service Corp., 104 F.2d 107, 110 (2d Cir.1939). Berry stated:
 
 
 22
 Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender. [Federal] courts, equally with those of the state, are possessed of ample power to protect the administration of justice from being thus hampered or interfered with. Nor is this power in any wise limited by [the predecessor to 18 U.S.C. Sec. 401].
 
 
 23
 104 F.2d at 110-11, quoting, Lineker v. Dillon, 275 F. 460 (D.N.D.Cal.1921). The mandate of an injunction issued by a federal district court runs nationwide, Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 451, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932), and "[v]iolation of an injunctive order is cognizable in the court which issued the injunction regardless of where the violation occurred." Stiller v. Hardman, 324 F.2d 626, 628 (2d Cir.1963).
 
 
 24
 Enforcement of an injunction through a contempt proceeding must occur in the issuing jurisdiction because contempt is an affront to the court issuing the order. See, e.g., Leman, supra, 284 U.S. at 452, 52 S.Ct. at 240 (Disobedience constituted contempt of the court which entered the decree....); Wilson v. United States, 26 F.2d 215, 218 (8th Cir.1928); Bedgood v. Cleland, 554 F.Supp. 513, 517 (D.Minn.1982).
 
 
 25
 [T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the [ordering] court.... To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency.... [T]he sole adjudication of contempts, and the punishments thereof [belong] exclusively ... to each respective court.
 
 
 26
 In re Debbs, 158 U.S. 564, 594-95, 15 S.Ct. 900, 910, 39 L.Ed. 1092 (1895) (citations omitted).
 
 
 27
 A court may therefore hold an enjoined party in contempt, regardless of the state in which the person violates the court's orders. Leman, 284 U.S. at 454, 52 S.Ct. at 241 ("This is one of the decencies of civilization that no one would dispute.") Our research, however, has uncovered no cases which explicitly discuss whether a court may exercise jurisdiction over a nonparty that knowingly aids and abets a violation of a court's orders but lacks other contacts with the forum.
 
 
 28
 Alternative rationales support such jurisdiction. The first looks to the inherent power of the court to act, and does not rely on traditional in personam jurisdiction analysis. The second analyzes the respondents' actions under International Shoe and its progeny to determine whether sufficient minimum contacts exist to exercise jurisdiction over them. There being significant support under both analyses, we hold that jurisdiction was proper.
 
 C
 
 29
 An injunction binds not only the parties subject thereto, but also nonparties who act with the enjoined party. Ex Parte Lennon, 166 U.S. 548, 555, 17 S.Ct. 658, 660-61, 41 L.Ed. 1110 (1897); McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339, 344 (9th Cir.1966); Alemite Mfg. Corp. v. Staff, 42 F.2d 832 (2d Cir.1930); Fed.R.Civ.P. 65(d). Rule 65(d):
 
 
 30
 is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence ... defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.
 
 
 31
 Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945). See also Ex parte Lennon, 166 U.S. at 554, 17 S.Ct. at 660; Reich v. United States, 239 F.2d 134, 137 (1st Cir.1956), cert. denied, 352 U.S. 1004, 77 S.Ct. 563, 1 L.Ed.2d 549 (1957); Alemite, supra at 832.
 
 
 32
 This principle could easily be thwarted if a court could only enforce its injunctions over nonparty aiders and abettors who resided within the court's territory for service of process. The nationwide scope of an injunction carries with it the concomitant power of the court to reach out to nonparties who knowingly violate its orders. See Ex parte Lennon, 166 U.S. at 555, 17 S.Ct. at 660-61; Alemite, 42 F.2d at 832. Cf. Wilgus v. Paterson, 335 F.Supp. 1385, 1389-90 (D.Del.1972). MacKay's actions in this case are a paradigm of how a defendant can enlist the aid of out-of-state individuals in an attempt to frustrate the orders of the district court. When Currey and Johnson knowingly participated in his scheme to dissipate the funds they equally knowingly subjected themselves to the jurisdiction of that court.
 
 
 33
 When ... the respondents undertook to render this judgment nugatory and valueless by lending their aid to remove the only tangible property of the judgment debtor beyond the reach of process, they were as guilty of violating the court's order as though it had forbidden their acts in positive terms, and under well-established principles their acts constituted a contempt of the court.
 
 
 34
 Lineker, 275 F. at 470. Nothing respondents suggest persuades us to the contrary.
 
 IV
 
 35
 Respondents admit that a federal court's injunction is effective anywhere within the United States, but contend this is true only as to parties over whom the court has traditional in personam jurisdiction. If the district court lacked personal jurisdiction over respondents, they argue that it also lacked power to hold them in contempt and to implicitly decide the ownership interests of the property in question. In reliance on the district court's statement that it lacked "traditional in personam jurisdiction," respondents thus conclude that the court could not cite them for contempt. To support their argument, respondents first proffer case authority and then focus on the Federal Rules of Civil Procedure.
 
 
 36
 * Respondents first assert that Heyman v. Kline, 444 F.2d 65 (2d Cir.1971), controls the decision in this case. Heyman, however, is clearly distinguishable from the present controversy. Heyman stated that if a nonparty asserts an independent interest in the subject property and is not merely acting on behalf of the defendant, then Rule 65(d) does not authorize jurisdiction over the party. In contrast, the district court found that Currey and Johnson had no independent interest in the property, and that they merely acted as agents for MacKay in dissipating the funds. As will be shown in Part VI below, the district court's findings are not clearly erroneous. The district court has the power to prevent MacKay from secreting the funds, and it also may enjoin his aiding and abetting agents. The provisions of the district court's injunction cover Currey and Johnson because they failed to demonstrate an independent interest in the property. Heyman fails to support respondent's argument.
 
 
 37
 Respondents also rely on Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) for the proposition that no jurisdiction lies to grant in personam relief against one not a party and not served with process. The Supreme Court stated:
 
 
 38
 It is elementary that one is not bound by a judgment in personam resulting from litigation which he is not designated as a party or to which he has not been made a party by service of process. [citation omitted.] The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant.
 
 
 39
 395 U.S. at 110, 89 S.Ct. at 1569, 23 L.Ed.2d at 140.
 
 
 40
 We again find no conflict between respondent's authority and our decision in this appeal. By actively aiding and abetting MacKay, Currey and Johnson placed themselves within the personal jurisdiction of the district court. Zenith does not deny jurisdiction to a court whose order is so contempted. Rather, it supports our decision. This is shown by the Court's statement that under Rule 65(d), "a nonparty with notice cannot be held in contempt until shown to be in active concert or participation" with an enjoined party. Id. at 112, 89 S.Ct. at 1570 (emphasis supplied).
 
 
 41
 The district court in Zenith failed to make the determination of active concert and participation in a proceeding in which the nonparty was allowed to participate. In the case at bar, the respondents were made parties to the show cause order and were given an opportunity to prove that they did not aid or abet MacKay. When the court decided that Currey and Johnson fell within the ambit of its injunction, it could then exercise jurisdiction over them and adjudicate whether they violated the court's injunction.
 
 
 42
 Currey and Johnson next contend that Stiller, supra, cannot be extended beyond its holding which they insist stands merely for the proposition that an injunction cannot be summarily registered in a new forum. They argue that when an injunction order is transferred into a different forum, the defendants have a right to a plenary hearing on the merits. Furthermore, respondents cite the portion of Stiller in which the New York court (the new forum) acknowledged that the Ohio court (the original forum that issued the injunction) lacked jurisdiction over the New York respondents who were "privies" with the enjoined party. The Second Circuit implicitly rejected this argument, however, when it stated:
 
 
 43
 Violation of an injunctive order is cognizable in the court which issued the injunction, regardless of where the violation occurred.... [T]he Ohio district court had power to punish a violative infringement though the infringement took place in New York. There is therefore no such need for registration of injunctive orders as there is for registration of the money judgment.
 
 
 44
 324 F.2d at 628 (citation omitted). We agree with the Second Circuit and hold that a court may assert jurisdiction over persons who, with knowledge of the court's orders, actively aid and abet an enjoined party.
 
 
 45
 Respondents finally contend that Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc., 566 F.2d 8 (7th Cir.1977), conflicts with our holding. There, the district court enjoined Hydrocraft and two of its officers from infringing a patent owned by Panther Pumps. The third officer, Beck, who was not enjoined, shipped the assets to a distant state and commenced operations as a new business entity, Universal. Panther Pumps petitioned the court to hold Beck in contempt and to substitute the new corporation as a party subject to the original injunction.
 
 
 46
 The court held that it had jurisdiction to hold Beck in contempt, because as an officer of Hydrocraft, he was subject to the terms of the injunction. In contrast, the court refused to substitute Universal as a party to the original injunction because the court lacked personal jurisdiction of the new entity.
 
 
 47
 Respondents contend that the lack of jurisdiction of Universal corresponds to a similar deficiency in the present case. We disagree. The Seventh Circuit carefully noted that the district court lacked jurisdiction over Universal because only Beck had been subject to the show cause order. The district court did not make a finding that the corporation had knowingly violated the court's injunction. Therefore, the court in Panther Pumps could not assert jurisdiction of Universal. In contrast, the court here brought both Currey and Johnson into the show cause hearing, and specifically found the requisite knowing violation of its order. The court thus properly asserted personal jurisdiction to adjudicate its contempt orders.
 
 B
 
 48
 Respondents additionally rely on the Federal Rules of Civil Procedure to support their argument. First, they contend that Rule 65(d) cannot provide jurisdiction and, in fact, prevents a court from asserting more jurisdiction than that which it already possesses. They rely on Fed.R.Civ.P. 82 for support. Rule 82 states in pertinent part, "[t]hese rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein." Respondents thus argue that the district court could not assert jurisdiction pursuant to Rule 65(d) unless it independently satisfied the requirements for in personam jurisdiction.
 
 
 49
 We do not rely on Rule 65(d) to extend the jurisdiction of the district courts beyond that power which the courts inherently possess. As Regal-Knitwear observes, Rule 65(d) merely codified the common law power of a court to enforce its own injunctions. It is that common law power coupled with the knowing, voluntary acts of Currey and Johnson rather than any power emanating from Rule 65(d) that form the basis for the district court's proper exertion of personal jurisdiction over them in this contempt proceeding.
 
 
 50
 Respondents next contend that Fed.R.Civ.P. 4(f) limits the reach of a court to enforce its orders by use of civil contempt to a maximum of 100 miles beyond the forum state's borders. They rely on the portions of Rule 4(f) emphasized below:
 
 
 51
 (f) Territorial Limits of Effective Service.
 
 
 52
 All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state. In addition, persons who are brought in as parties pursuant to Rule 14, or as additional parties to a pending action or a counterclaim or cross-claim therein pursuant to Rule 19, may be served ... at all places outside the state but within the United States that are not more than 100 miles from the place in which the action is commenced, or to which it is assigned or transferred for trial; and persons required to respond to an order of commitment for civil contempt may be served at the same places.
 
 
 53
 Respondents' reading of Rule 4(f) is too restricted. The 100 mile limitation applies to an order of commitment for civil contempt, not for an order to show cause why a party should not be held in contempt. "Rule 4(f) sets limits only on the range of service of the order of commitment, which should be carefully distinguished from the other [phases of] the contempt proceeding, ... including the order to show cause why a party should not be held in contempt...." 4 Wright & Miller, Federal Practice and Procedure, Sec. 1129 (1969). If respondents' interpretation was correct, then a court could not issue a show cause order to a party that violated the court's orders beyond the 100 mile limit. As demonstrated earlier, however, courts clearly have the power to serve a defendant to show cause wherever the alleged contemnor currently resides. Leman, supra, 284 U.S. at 451, 52 S.Ct. at 240.
 
 
 54
 The Federal Rules of Civil Procedure do not expand or restrict the jurisdiction that the court otherwise possesses. See Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 445, 66 S.Ct. 242, 246, 90 L.Ed. 185 (1946); Vaughan v. Empresas Hondurenas, S.A., 171 F.2d 46, 47 (5th Cir.1948); United Office & Professional Workers of America v. Smiley, 75 F.Supp. 695, 699 (E.D.Pa.1946); Fed.R.Civ.P. 82. Because the court had jurisdiction of Currey and Johnson as a result of their knowing and voluntary participation with the contumacious party, service of process was not prohibited by rule 4(f).
 
 
 55
 Indeed, Rule 4(f) allows extraterritorial service if authorized by statute or "these rules." Rule 4(e) provides in part:
 
 
 56
 Whenever a statute or rule of court of the state in which the district court is held provides ... for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule.
 
 
 57
 We therefore examine whether Mississippi statutory law would permit service upon these respondents, and if so, whether due process permits the exercise of that jurisdiction under the facts of this case. Prejean v. Sonatrach, Inc., 652 F.2d 1260, 1264 & n. 3 (5th Cir.1981). We treat the latter part of this issue in Part V of this opinion.
 
 
 58
 Mississippi allows for service upon nonresidents pursuant to Miss.Code Ann. Sec. 13-3-57 (Supp.1984), which provides in pertinent part:
 
 
 59
 Any nonresident person ... or ... corporation not qualified under the constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident ... shall by such act or acts be deemed to be doing business in Mississippi.
 
 
 60
 Mississippi allows for service on nonresidents who commit acts outside the state with foreseeable effects resulting within the forum. Mississippi Interstate Express, Inc. v. Transpo, Inc., 681 F.2d 1003, 1007 (5th Cir.1982), cited with approval in, First Mississippi National Bank v. S & K Enterprises of Jackson, Inc., 460 So.2d 839, 843 (Miss.1984). In Mississippi Interstate, the court found that a breach of Mississippi-centered contract occurring outside the state caused the nonpayment in Mississippi of amounts due there. This constituted sufficient contact with the forum to permit jurisdiction of the nonresidents. 681 F.2d at 1012. Cf. First Mississippi, 460 So.2d at 840-43. Similarly, the respondents in the present case intentionally committed actions in Texas which resulted in the nonpayment of amounts due into the court located in Mississippi.
 
 
 61
 This Mississippi statute does not require that the part of the tort which causes injury occur in Mississippi. Rather, only a part of the tort must occur in the state. Breedlove v. Beech Aircraft Corp., 334 F.Supp. 1361, 1365 (D.Miss.1971). When MacKay took funds beyond the borders of the state in furtherance of his plan to secrete the funds with the knowledge and consent of Currey and Johnson, this action satisfied the in-state requirement as far as respondents are concerned. We therefore hold that the Mississippi statutes would permit the assertion of jurisdiction over respondents based on the facts of this case.
 
 
 62
 We observe in this connection that the Waffenschmidts' suit against MacKay was grounded in the Securities Act of 1933 and the Securities Exchange Act of 1934, each of which provide for nationwide service of process. 15 U.S.C. Secs. 77v(a), 78aa. In reaching our decision, however, we do not reach the issue whether such nationwide jurisdictional provisions would of themselves establish jurisdiction over alleged non-party contemnors. Though the district court found it had jurisdiction under the securities acts to issue the TRO and preliminary injunction, it made no such findings as to jurisdiction over Currey or Johnson, and the litigants have not argued this question. Instead, we find that jurisdiction exists based on both the inherent power of a court to reach those who knowingly contemn its orders and the minimum contacts analysis set out below.
 
 V
 
 63
 Currey and Johnson vigorously maintain that the assertion of jurisdiction over them violates minimum due process requirements as established by International Shoe and its progeny. A finding, however, that a nonparty has aided a party in knowingly violating an injunction satisfies due process. We reach this conclusion under a two part analysis: first, through an examination of the inherent powers of a court, and second, through traditional in personam jurisdiction analysis under International Shoe.
 
 
 64
 * Haling a person into court only upon finding that the nonparty has aided in knowingly violating an injunction fulfills traditional notions of fair play and substantial justice because it is foreseeable that the person would be required to respond in that forum. See World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). By knowingly aiding MacKay, Currey and Johnson could reasonably anticipate that they would have to justify their actions to the court in Mississippi or suffer contempt remedies. See id.; Kulko v. California Superior Court, 436 U.S. 84, 97-98, 98 S.Ct. 1690, 1699-1700, 56 L.Ed.2d 132 (1978); Shaffer v. Heitner, 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977).
 
 
 65
 Another factor for consideration is the relative burdens on the parties in litigating in a distant forum. The inconvenience to these respondents in having to defend themselves in a distant forum is balanced against the greater burden on the judicial system in having to conduct duplicitous proceedings in both Mississippi and Texas. Moreover, the Texas court cannot benefit from the Mississippi court's intimate familiarity with the case. Because the Mississippi court's injunction is not registerable in Texas, the Texas court would have to retry the evidence. See Stiller, 324 F.2d at 628. The plaintiffs also suffer a heavy burden in having to commence actions wherever the enjoined party and his agents choose to secrete the enjoined funds. Because respondents were required to defend themselves against the contempt charge only upon a finding that they knowingly aided in a violation of the court's orders, any inconvenience they must suffer resulting from litigating in a distant forum only results from their own actions. The balance of burden clearly preponderates in favor of jurisdiction in the court whose injunction is knowingly contempted.
 
 
 66
 Finally, a significant if not controlling factor in our decision is the special interest of the forum court in litigating the matter. The Supreme Court gave this factor great weight in McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 223 (1957). In McGee, the California court exercised jurisdiction of an Arizona corporation whose only contacts with the forum were the mailing of one insurance policy and several premium notices into the state. In asserting jurisdiction, the court relied on California's significant interest in providing relief to its residents when insurance companies refused to pay claims. The Court also noted the inconvenience to the plaintiffs in having to chase the defendant to a distant state. Id. at 223, 78 S.Ct. at 201.
 
 
 67
 We find in the present appeal that the special interest of the district court was at least as strong as that in McGee. The manifest need for a court to protect and enforce its own judgments is beyond doubt. The loss of such power would severely impair the integrity and authority of our judicial system. A foreign court could not assert as strong an interest in ensuring that the issuing court's injunction was enforced.
 
 
 68
 Thus, upon consideration of the foreseeability of having to answer to the enjoining forum, the relative convenience of the parties, and the special interest of the forum court in litigating the matter, we conclude that traditional notions of due process are not offended by permitting jurisdiction of these respondents.
 
 B
 
 69
 We turn now to an analysis of traditional in personam jurisdiction and conclude that despite the district court's conclusion that respondents possessed insufficient contacts, the court could assert traditional in personam jurisdiction over Currey and Johnson. We accept the court's conclusions that the sole "contact" these respondents had with Mississippi was their acceptance and dissipation of the enjoined funds from MacKay in Texas as his agents, with knowledge of the court's orders. We hold that, as a matter of law, this conduct is sufficient to satisfy the due process requirements as announced in International Shoe and its progeny.
 
 
 70
 Originally, due process required the "presence" of the person in the state before a court possessed such jurisdiction. Pennoyer v. Neff, 95 U.S. (5 OTTO) 714, 24 L.Ed. 565 (1877). International Shoe expanded this rule by permitting jurisdiction if the person had sufficient minimum contacts with the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158.
 
 
 71
 While state service of process statutes may not reach beyond this limit, Prejean, 652 F.2d at 1264, "due process does not compel the states to assert jurisdiction this far." Id. See also Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 440, 72 S.Ct. 413, 415, 96 L.Ed. 485 (1952). We determined earlier, however, that the Mississippi long-arm statute permits jurisdiction over these respondents. We will additionally examine whether the assertion of personal jurisdiction over Currey and Johnson satisfies due process. Whether minimum contacts exist depends on the facts of each case. Kulko, 436 U.S. at 92, 98 S.Ct. at 1697.
 
 
 72
 Respondents allege that because they committed no act in Mississippi, they are not subject to the jurisdiction of courts located in that state, including United States district courts. As Mississippi Interstate illustrates, courts may assert jurisdiction of a person who acts outside the forum, but causes effects within it. As we stated in Prejean at 1268 (footnotes omitted):
 
 
 73
 When a defendant purposefully avails himself of the benefits and protection of the forum's laws--by engaging in activity in the state or engaging in activity outside the state that has reasonably foreseeable consequences in the state--maintenance of the lawsuit does not offend traditional notions of fair play and substantial justice. Considerations such as the quality, nature, and extent of the activity in the forum, the foreseeability of the consequences within the forum from activities outside it, and the relationship between the cause of action and the contacts, relate to whether it can be said that the defendant's actions constitute "purposeful availment." In other words, a defendant's activities in relation to the state indicate he is on notice that he could be haled into its courts.
 
 
 74
 The actions of Currey and Johnson satisfy these requirements. They purposefully engaged in activity outside Mississippi that would have the foreseeable and intended result of dissipating assets subject to marshalling in that forum. The jurisdictional issue turns solely on the consequences which their acts had in Mississippi. The court is not trying to assert general in personam jurisdiction over these respondents for causes of action unrelated to their actions; it merely is holding them responsible for the intended consequences which their nonforum activities had on the subject matter of the court's order. See generally Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1170-71 (5th Cir.1985). When Currey and Johnson purposefully accepted assets from MacKay which they knew were subject to an injunction by the district court in Mississippi, they cannot now complain that it was unforeseeable or unreasonable for them to be haled before that court. Accord McGee, supra.
 
 
 75
 Prejean listed three factors to determine whether purposeful availment exists when an out-of-state act causes effects within the forum:
 
 
 76
 (1) the existence and degree of purposefulness with which the effect in that forum was created;
 
 
 77
 (2) whether the defendant has other substantial contacts with the forum unrelated to the suit; and
 
 
 78
 (3) the substantiality of the effect itself.
 
 
 79
 652 F.2d at 1269. Prejean also provided initial guidance in interpreting the interaction of these factors. We held that in all cases, the effect in the forum must have been purposeful. Satisfying this factor alone may justify the assertion of jurisdiction if the conduct is sufficiently intentional. If purposefulness is present but not very strong:
 
 
 80
 the presence of one or both of the other two factors becomes crucial. If the creation of the effect is at least purposeful and the effect substantial, no other contacts are needed. On the other hand, if the effect of minimally purposeful creation is not substantial, other substantial contacts must exist. In other words, the stronger the form of the purposefulness, the less substantial must be either the effect or the other contacts.
 
 
 81
 Id. (citations omitted).
 
 
 82
 Currey and Johnson intended that their actions would have the effect of placing funds outside the reach of the Mississippi forum. "Purposeful creation is strongest when the defendant intended the impact to be felt in the forum." Id. at 1269 n. 18. See also Black v. Acme Markets, 564 F.2d 681, 685 (5th Cir.1977). See generally, Restatement (2d) Conflict of Laws, Sec. 37 (noting also that jurisdiction may lie if it is reasonable); Scoles & Hay, Conflict of Laws Sec. 8.23, at 289 (1982). Furthermore, intentionally violating a court's orders has a substantial effect on the administration of justice in general, as well as the proper completion of the Waffenschmidts' litigation in particular. Because their actions were intentional and the effects substantial, under Prejean, the lack of other contacts with Mississippi therefore does not defeat the exercise of jurisdiction.
 
 VI
 
 83
 Currey and Johnson contend that even if the court had personal jurisdiction, its finding that they aided and abetted MacKay was clearly erroneous. Likewise, the Waffenschmidts contend that the finding that the Bank did not aid or abet MacKay was erroneous. We treat the evidence pertaining to each respondent individually, and conclude that in each instance, the record sufficiently supports the district court's findings. We therefore find no clear error.
 
 A. Currey
 
 84
 Currey admitted that he knew of the TRO and the preliminary injunction when he prematurely cashed the $103,500 T-Note and interest coupon in October, 1983. He claims, however, that he received the funds from MacKay in early March, 1983 in good faith without notice of the court's orders. Accordingly, he asserts that he is a bona fide purchaser of the negotiable T-Note, and thus received good title to it. If true, then Currey asserts that he could negotiate the note even with knowledge of the court's orders, due to the policy favoring the ready negotiability of government notes. See U.C.C. Sec. 3-305. We need not decide this issue, however, because the district court implicitly rejected his claim of good faith by holding that he accepted the note with knowledge of the court's orders.
 
 
 85
 The evidence amply supports this finding. According to Currey, he received the note from MacKay between March 1 and 10, which was before the TRO was issued by the district court on March 16. The Waffenschmidts, however, proved that MacKay did not receive the T-Notes from the Bank until March 18.
 
 
 86
 Currey claims he received the note in connection with an alleged oral contract to sell MacKay a Holiday Inn hotel. Currey had previously sold another hotel and had retained an attorney and executed a written contract evidencing the sale. In contrast, for the MacKay transaction Currey admitted that he never documented the transaction or disclosed the sale to his wife or children, who were co-owners of the hotel. Neither did he discuss the sale with his bank, which was financing a substantial renovation of the inn.
 
 
 87
 The sale was never consummated, so Currey never transferred title to the hotel to MacKay. Despite having received the $103,500 T-Note and coupon from MacKay on a transaction that was never completed, and with full notice of the court's TRO, preliminary injunction, and contempt order against MacKay, Currey still prematurely cashed the T-Note in October of 1983 and applied the proceeds to the hotel renovations. However, he could not recall the name of the company to which he sold the T-Note and coupon. He again neglected to inform his banker that additional funds were being used for the hotel renovation.
 
 
 88
 Ample evidence therefore supports the finding that Currey did not receive the T-Note in good faith without notice of the court's orders. The district court clearly could find that the "sale" of the Holiday Inn was a sham. Further, Currey admitted he cashed the note with full knowledge of the court's orders. We find no clear error, then, in the court's finding that Currey aided or abetted MacKay in dissipating the funds.
 
 
 89
 Currey contends, however, that the court based its findings solely on his lack of credibility as a witness. In its opinion, the district court invoked the rule of Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir.1952), which states that the demeanor of a witness who has a motive to deny may justify a belief that not only is his testimony not true, but that the truth is the opposite of the witnesses' story.
 
 
 90
 As respondents correctly explain, the Dyer rule cannot serve as the sole evidence to carry the burden in a civil case. See Nishikawa v. Dulles, 356 U.S. 129, 137, 78 S.Ct. 612, 617, 2 L.Ed.2d 659 (1958). Plaintiffs must still prove that respondents aided or abetted MacKay through clear and convincing evidence. See Perfect Fit Industries, Inc. v. Acme Quilting Co., 646 F.2d 800, 809-10 (2d Cir.1981); Stringfellow v. Haines, 309 F.2d 910, 912 (2d Cir.1962).
 
 
 91
 Currey ignores, however, the abundance of other proof that the district court could have relied on to find that the alleged hotel sale was mere pretense. The district court did not expressly limit its findings to an invocation of the Dyer rule. This other proof, when viewed in conjunction with the Dyer rule, supports the finding that Currey aided and abetted MacKay. Accord Lineker v. Dillon, 275 F. at 463-64. We find no error here.
 
 B. Johnson
 
 92
 Johnson also raises the Dyer argument, contending that the evidence was insufficient to support an aiding or abetting finding. We disagree.
 
 
 93
 Johnson was the sole owner of D & K, which engaged in selling motorcycles, boats, motors, trailers, jet skis, and other sporting goods. D & K changed from a proprietorship to a corporation on January 24, 1983. That day, Johnson also signed as an incorporator of Tuff Tire Texas, Inc., which was owned by MacKay. Both corporate charters had been prepared by Johnson's legal counsel. Johnson never exercised duties for Tuff Tires, except to ship goods from a warehouse adjacent to D & K.
 
 
 94
 MacKay and Johnson had extensive business dealings, however, and Johnson purportedly received the $100,000 T-Note in connection with these activities. As early as March of 1982, MacKay purchased five jet skis from D & K for $10,500. Thereafter, MacKay became a substantial customer of D & K. According to Johnson, D & K would deliver to MacKay whatever he requested, and MacKay would usually settle his account by paying D & K a lump sum in a rounded amount.
 
 
 95
 Johnson claims MacKay paid D & K the $100,000 T-Note sometime in February or early March of 1983 as satisfaction for services and equipment which MacKay had purchased. Again, MacKay did not receive the T-Note until March 18, so the court could discredit Johnson's testimony. Further, Johnson could only document approximately $5,000 worth of outstanding debt for MacKay, which included several questionable repair bills.
 
 
 96
 Johnson's subsequent handling of the T-Note also adds to the incredulity of his story. He admitted that he knew the T-Note was negotiable by any bearer. Yet, he kept the note for three months in a filing cabinet in his store where he placed business records and invoices. He then cashed the T-Note on June 14, 1983, despite its later maturity date. Furthermore, although the note was paid to settle a D & K account, Johnson placed the proceeds from this note in a personal account under the name "James K. Johnson." Johnson, however was generally known by his middle name, "Kendall" or "Ken." Johnson admitted that before he cashed the T-Note, MacKay had told him that he was "under a lawsuit."
 
 
 97
 Finally, the rapid manner in which Johnson dissipated the proceeds from this note supports the incredible nature of his story. Between June 14 and 30, he spent all but $516.42 of the proceeds. Included in his purchases were two boats with motors and trailers worth $31,042.50. Johnson pledged these assets to the court in lieu of the supersedeas bond. Our discussion of this substitution is treated in Part VIII below. Johnson also made $71,300 in cash withdrawals, usually in $8,000 blocks, purportedly to purchase used equipment at motorcycle auctions and for other untraceable transactions. Johnson, however, was unable to adequately document these purchases, nor could he specifically itemize which products were purchased with the proceeds from the note.
 
 
 98
 Based on the foregoing evidence, the court could properly conclude that Johnson's story was inherently incredible and that he accepted the T-Note from MacKay with full knowledge that the funds were subject to the court's injunction. The court could properly rely on the Dyer rule and the other proof to reach this conclusion.
 
 
 99
 Johnson contends that no evidence was offered to prove that he knew of the court's orders prior to cashing the T-Note. He thus asserts that the court improperly relied on its disbelief of Johnson as the sole evidence of such knowledge. The court, however, had ample circumstantial evidence to support its finding that Johnson had the requisite notice of the court's orders before cashing the note. Plaintiffs are not required to adduce direct evidence that Johnson had actual notice of the court's orders. See United States v. Palacios, 556 F.2d 1359, 1364 (5th Cir.1977); United States v. Warner, 441 F.2d 821, 825, 830 (5th Cir.), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Such proof is often unavailable. They may carry their burden of proving that Johnson had notice, as long as the proof is clear and convincing. Proof of Johnson's activities relating to his disposition of the funds, plus his demeanor at trial provided sufficient evidence of his knowledge and intent to meet plaintiffs' burden. The evidence supports the district court's finding that Johnson aided and abetted MacKay in dissipating the enjoined funds. We find no error here.
 
 C. The Bank
 
 100
 The Waffenschmidts object to the release of the Bank when the court found it acted in good faith in its dealings with MacKay. They contend that good faith is irrelevant to a finding of civil contempt, because civil contempt is designed to compensate a plaintiff, not to punish the defendant. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499-500, 93 L.Ed. 599 (1948); Union Tool Co. v. Wilson, 259 U.S. 107, 111-12, 42 S.Ct. 427, 428-29, 66 L.Ed. 848 (1922); Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 128 n. 2 (2d Cir.1979); Doe v. General Hospital of District of Columbia, 434 F.2d 427, 431 (D.C.Cir.1970). Therefore, they contend that the Bank should have been held in civil contempt, despite its apparent good faith.
 
 
 101
 The Waffenschmidts misinterpret the court's holding. Although good faith is irrelevant as a defense to a civil contempt order, good faith is relevant to whether the Bank aided or abetted MacKay in dissipating the funds with knowledge that it was violating the court's orders. When the court found that the Bank failed to act as MacKay's agent, it could not exercise jurisdiction over the Bank. The court, therefore, never reached the issue of whether the Bank was in contempt of its orders, or if any valid defenses were present to militate against a contempt order.
 
 
 102
 A review of the evidence demonstrates that the district court's finding that the Bank did not aid or abet MacKay was not clearly erroneous. The Bank admittedly received a copy of the TRO and its extension through May 27, 1983. Its president, Greer, referred the TRO to the Bank's counsel, who cautioned that the Bank should not act out of the normal course of its regular business dealings with MacKay. The TRO specifically allowed persons to continue such regular dealings with MacKay. The Bank also contacted MacKay for an explanation, who assured the Bank that the TRO involved no funds concerning his dealings with the Bank. While the Waffenschmidts are highly critical of this negligent action, it does not affect the conclusion that the Bank did not actively aid or abet MacKay with knowledge that it was violating the court's orders.
 
 
 103
 The Bank, relying on MacKay's assurances, loaned him funds, but required him to pledge a note or coupon as collateral for each transaction. The Bank thus acquired a "cash equivalent" as security, in light of MacKay's questionable dealings in Mississippi. MacKay told the Bank on June 2, 1983 that he would be unable to repay the loans and instructed the Bank to apply the proceeds of the T-Notes to his debt. When the Bank acted upon these instructions, however, it did not violate any known court order, because the TRO that it had received expired by its own terms on May 25, 1983. The Bank did not receive a copy of the preliminary injunction until July 25, 1983. Thus, at the time the Bank sold the T-Notes and coupons, it was aware of no existing order of the court that it would be violating. These findings by the district court are not clearly erroneous; therefore, it correctly held that it lacked jurisdiction of the Bank to hold it in contempt.
 
 VII
 
 104
 All parties appeal the district court's adverse rulings concerning attorney's fees. The award or denial of attorney's fees by a district court will not be overturned absent an abuse of discretion. In re Hunt, 754 F.2d 1290, 1294 (5th Cir.1985). Based on the evidence discussed in the preceding sections, the court had ample evidence to conclude that Currey and Johnson aided and abetted MacKay in violating the court's injunction. This vexatious conduct justified the award of attorney's fees against them. See F.D. Rich Co., Inc. v. United States ex rel Industrial Lumber Co., Inc., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). The court was also well within its discretion in concluding that the Waffenschmidts had a sufficiently viable claim to require the Bank to bear its own attorney's fees. The Waffenschmidts could not collect attorney's fees from the Bank when the Bank prevailed on the merits both in the district court and on appeal. The same holds true for Currey and Johnson in their attempt to collect fees from the Waffenschmidts. The parties have failed to demonstrate any abuse of discretion by the trial court. We affirm the court's rulings on this issue.
 
 VIII
 
 105
 Finally, the Waffenschmidts object to the substitution of the $31,042.50 worth of boats, motors, and trailers in place of a supersedeas bond in the amount of $106,840.09. They contend that this action has unjustly jeopardized their right to collect on the judgment.
 
 
 106
 "[A] supersedeas bond is a privilege extended to the judgment debtor as a price of interdicting the validity of an order to pay money." Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir.1979). We stated in Poplar Grove, however, that if the judgment debtor demonstrates that his "financial condition is such that the posting of a full bond would impose an undue financial burden, the court ... is free to exercise a discretion to fashion some other arrangement for substitute security ... which would furnish equal protection to the judgment creditor." Id. at 1191.
 
 
 107
 The district court reviewed Johnson's assets, and Johnson offered to pledge any of them as security pending this appeal. The court concluded that the pledge of the $31,042.50 worth of assets would serve as sufficient collateral since the values in the remaining assets were already encumbered. Waffenschmidt does not contend that the court did not require the pledge of all property values then possessed by Johnson. Rather than deprive Johnson of his right to a stay of execution on the judgment pending appeal, the district court permitted the substitution.
 
 
 108
 The Waffenschmidts' appeal on this issue stands in a unique and somewhat frustrating position. They did not seek preliminary relief from this order pending appeal, leaving us instead to decide this matter in conjunction with the remainder of the case. At this late stage in the appeal, we cannot afford the Waffenschmidts the relief they seek without severing this aspect of the case from the other issues. The Waffenschmidts have not asked us to do so, and we are not persuaded that a severance on this issue would serve the interests of justice. Severing this issue is as likely to impede as to facilitate a prompt resolution of this appeal and the payment into the court of the proceeds from the MacKay transaction.
 
 
 109
 Any decision we would make on the supersedeas issue would have no effect until the mandate issued from this court. Once our mandate issues affirming the judgment, the Waffenschmidts no longer need a supersedeas bond--they may execute on the judgment. If Johnson has sufficient assets to satisfy the judgment, the Waffenschmidts may reach them. If, however, Johnson lacks sufficient assets, reversing the district court in this issue as a part of this judgment would be unavailing.
 
 
 110
 Should further proceedings in this or another court delay the Waffenschmidts' ability to execute on their judgment and the Waffenschmidts can show any change of circumstances since the district court's initial ruling, such as an improved financial condition of Johnson, they may petition the district court to reconsider the substitution. At this juncture of this appeal, we cannot provide greater relief.
 
 
 111
 We affirm the judgment of the district court in all respects. We do not reach the issue of the substitution of collateral.
 
 
 112
 AFFIRMED.