Raymon and Joann LYNCH, et al., Plaintiffs,

v.

Peter RANK, et al., Defendants.

No. C–83–2340 WHO.

United States District Court, N.D. California.

Dec. 18, 1985.

Daniel Brzovic, Bet Tzedek Legal Services, Los Angeles, Cal., Evelyn R. Frank, Legal Aid Soc. of Alameda County, Oakland, Cal., for plaintiffs.

John K. Van De Kamp, Atty. Gen., Charlton G. Holland, Catherine M. Van Aken, San Francisco, Cal., for defendant Rank.

Joseph Russoniello, U.S. Atty., John F. Barg, Asst. U.S. Atty., San Francisco, Cal., for third party defendant Heckler.

## OPINION AND ORDER

ORRICK, Senior District Judge.

This case comes before the Court on plaintiffs' motion to have Mr. Keith Putnam, the Assistant Director of the Oregon Department of Human Resources, held in contempt for his failure to take certain action to bring Oregon into compliance with a previous order of this Court. The issue of law presented by the motion is whether the Court has personal jurisdiction over Mr. Putnam. For the reasons stated below, the Court finds it does not have jurisdiction and, therefore, denies the motion.

### I

Certain background information is essential to understanding the problem. This case involves the interpretation of and compliance with the Pickle Amendment to the Social Security Act, 42 U.S.C. § 1396a (note) (1983), which was "to insure that an increase intended to benefit the aged and disabled would not have inadvertent harmful effects." S.Rep. No. 94–1265, 94th Cong., 2d Sess. 28 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5997, 6022. Plaintiffs herein comprise a nationwide class of social security recipients who argued that the Secretary of Health and Human Services (the "Secretary") and her state administrative counterparts incorrectly applied the Amendment by invoking it only when it appeared that a recipient lost his or her right to Supplemental Security Income ("SSI") benefits "solely" because of a social security cost-of-living increase. Plaintiffs further argued that the Pickle Amendment applies a "but for" test, that is, if one would still be entitled to SSI benefits *but for* the social security cost-of-living increase, then one would qualify under the Amendment for continued Medicaid benefits. On March 9, 1984, this Court, *inter alia,* permanently enjoined the Secretary "and all persons acting in concert or participating" with her from "permitting or requiring any state to deny Medicaid benefits to persons otherwise entitled thereto under the Pickle Amendment, on the basis of the 'solely' test presently codified at 42 C.F.R. § 435.135." *Lynch v. Rank,* 604 F.Supp. 30, 40 (N.D.Cal.), *aff'd,* 747 F.2d 528 (9th Cir.1984). On July 17, 1974, this Court ordered the Secretary to implement a plan for compliance immediately as to new applicants for and current recipients of Medicaid, and to take certain steps to identify other aged and disabled people who should be eligible for benefits under the Pickle Amendment ("Pickle eligible"). On October 16, 1984, the Court ordered the Secretary to require the states to send notices to current Title II recipients who are potentially Pickle-eligible class members. On August 21, 1985, the Court issued an order to show cause why the Secretary; Gerald J. Reilly, Director of the Division of Medical Assistance of the Washington Department of Social and Health Services; and Keith Putnam, Assistant Director of the Oregon Department of Human Resources, should not be held in contempt for disobedience of the above orders. The matter was heard September 20, 1985, at which time plaintiffs' counsel informed the Court that plaintiffs no longer sought to have the Secretary and Reilly adjudged in contempt.[1] Thus, the contempt proceedings continue only as against Putnam.

---

1. Plaintiffs seek to have the Secretary held in contempt only insofar as that is necessary to having Putnam held in contempt. Because the Court finds that there is no jurisdiction to proceed against Putnam, regardless of whether the Secretary is held in contempt, it is unnecessary to determine whether the Secretary disobeyed any of the subject orders.

Plaintiffs allege that Putnam has disobeyed the Court's orders in a number of ways. First, plaintiffs allege that Oregon did not issue instructions to its local offices implementing the "but for" test until June 26, 1985. If this allegation is true, it would mean that Oregon continued to deny benefits to some eligible recipients on the basis of the forbidden "solely" test even through June 6, 1985, more than fifteen months after this Court's March 9, 1984, permanent injunction. Second, plaintiffs allege that as of July 29, 1985, Oregon still had not distributed to its Medicaid staffers the worksheets necessary to determine Pickle eligibility. If this second allegation is true, then there is some question as to whether Oregon is applying the "but for" test even now. Finally, plaintiffs allege that Oregon refused on three occasions to send notices to potential Pickle-eligible residents within the State of Oregon, despite the fact that the state was capable of identifying such eligible persons from a computer tape supplied by the federal government, and from the state's own records.

As mentioned above, plaintiffs no longer seek to have the Secretary adjudged in contempt. However, it is crucial to note that plaintiffs allege concerted disobedience between Putnam and the Secretary. Plaintiffs contend that the Secretary was aware that Oregon would fail to send timely notice to potential Pickle-eligible recipients, yet failed to object. Furthermore, plaintiffs argue, it was not until May 1985, when the Secretary was ordered to produce a status report, that the Secretary performed the investigation necessary to discover that Oregon had decided (wrongly, plaintiffs contend) that it was *already* in compliance with the Court's orders. Plaintiffs further allege that on June 25, 1985, Putnam wrote to the regional office of the Health Care Financing Administration, Department of Health and Human Services, and again expressly refused to give potential eligible recipients notice. Finally, plaintiffs allege that although the Secretary has threatened to commence compliance proceedings against Oregon, she has never actually done so.

It is against this factual backdrop that the Court must decide whether to adjudge Putnam in contempt. Before the Court can reach the question of whether Putnam actually disobeyed the order, however, two jurisdictional questions must be resolved. The first question is whether this Court has personal jurisdiction over Putnam. The second question is whether this Court has subject matter jurisdiction to proceed against him. Because the Court finds that it does not have personal jurisdiction, it is unnecessary to reach either the subject matter jurisdiction question or the merits.

## II

The starting point in any determination of personal jurisdiction, of course, is the "minimum contacts" analysis first enunciated in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In the Ninth Circuit, the "minimum contacts" analysis has been broken down into three requirements that must be met before a nonresident defendant can be subjected to an exercise of jurisdiction. The first requirement is that the defendant have done some act by which he purposefully availed himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of that state's laws. The second requirement is that the cause of action arise out of the defendant's forum-related activities. The third requirement is that the exercise of jurisdiction be "reasonable". *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1287 (9th Cir.1977). Plaintiffs appear not to contest the fact that in Putnam's case, none of these requirements are satisfied. Thus, Putnam is not subject to personal jurisdiction under the "minimum contacts" analysis.

## III

Plaintiffs contend, however, that Putnam is subject to personal jurisdiction under the language of both Federal Rule of Civil Procedure 65(d) and the injunction in this case, which parrots Rule 65(d). Specifical-

ly, plaintiffs argue that because Putnam "acted in concert" and "participated" with the Secretary in disobeying this Court's orders, he submitted himself to the Court's jurisdiction. This contention must be scrutinized carefully. See *Cubbage v. Merchent*, 744 F.2d 665, 667 (9th Cir.1984) ("where a defendant challenges the sufficiency of personal jurisdiction, the plaintiff must bear the burden of establishing that the court does have jurisdiction"); *Data Disc, supra. Cf. United States v. Greyhound Corp.*, 363 F.Supp. 525, 569–70 (N.D.Ill.1973), *supplemented*, 370 F.Supp. 881 (1974), *aff'd*, 508 F.2d 529 (7th Cir.1974) (violations of injunctive orders must be proved by "clear and convincing evidence").

The seminal pronouncements regarding who may be bound by an injunction can be found in *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832 (2d Cir.1930), and in *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945). In *Alemite*, Judge Learned Hand stated the general rule on the scope of injunctions:

> [N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it.

42 F.2d at 832. In order to be subject to the contempt power, Putnam "must either abet the defendant, or must be legally identified with him." *Id.* at 833. Although Judge Hand wrote his *Alemite* opinion before the adoption of Rule 65(d), the pronouncements therein continue to be regarded as the classic statement of limitations on a court's equitable powers. Similarly, Justice Jackson's oft-cited opinion for the Court in *Regal Knitwear* emphasizes the limits on the permissible scope of an injunction:

> The courts * * * may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose

rights have not been adjudged according to law.

324 U.S. at 13, 65 S.Ct. at 481.

It is clear from both *Alemite* and *Regal Knitwear* that for Putnam to be subject to the Court's contempt powers, there must at the very least exist a strong identity of interests between the enjoined defendant and the would-be contemnor. Applied to this case, that means there must exist a commonality of incentives and motivations between the Secretary and Putnam. Absent such an identity of interests, it cannot be said that the Secretary and Putnam were acting "in concert" or "participating" with one another in disobedience of the Court's orders.

Plaintiffs have made no real showing that the interests and motivations of the Secretary on the one hand and Respondent Putnam on the other hand are identical, or even overlapping. At most, plaintiffs have made the conclusory statement that "[t]he Medicaid program, by its very nature, is a cooperative state-federal venture." Plaintiff's Memorandum of Points and Authorities in Support of Application for Order to Show Cause Re Contempt at 10. In an ideal state of affairs, perhaps it would be true that programs such as Medicaid would be purely cooperative ventures between governmental entities. In reality, however, the entities have divergent and sometimes conflicting interests. Here, for instance, the Secretary had a strong interest in seeing that the "but for" test was carried out, and that all appropriate notices to potential Pickle-eligibles were served. The Secretary stood to suffer the severe penalty of contempt if those tasks were not executed. The Secretary obviously had no concern whether the implementation of the "but for" test and the service of appropriate notice to Pickle-eligibles would create additional administrative expenses for the State of Oregon. The Secretary's interest was simply not to run afoul of this Court's commands. By contrast, Putnam was not under court order and reasonably had no expectation of being held in contempt should the "but for" test not be properly

implemented in Oregon. Putnam's duty, as an official of the State of Oregon, was to watch out for the state's best interests. Under these circumstances he may have concluded that for fiscal reasons it would be in Oregon's interests not to alter its existing practices. In his June 25, 1985, letter to Norman Meyer, the Associate Regional Administrator of the Health Care Financing Administration of the Department of Health and Human Services, Putnam stated that Oregon had decided not to send individual notice because "we can better use available staff and computer time for needed program improvements." Declaration of Evelyn Frank in Support of Application For Order to Show Cause Re Contempt, Exhibit 10 at 2. This is not to say that the Court condones or approves of Putnam's decision not to serve individual notice. The point is that Putnam obviously concluded that Oregon's best interests diverged from and in fact conflicted with the Secretary's interests on the matter of individual notice. Thus, it cannot fairly be said that the requisite identity of interests between the Secretary and Putnam existed for the purposes of Rule 65(d) and personal jurisdiction.

In the absence of such an identity of interests, the case authority mandates a finding that the Secretary and Putnam did not act in concert or participate with each other within the meaning of Rule 65(d) or for the purpose of establishing personal jurisdiction. The court in *Heyman v. Kline,* 444 F.2d 65, 66–67 (2d Cir.1971), squarely held that "Rule 65(d) does not grant a court power so broad 'as to make punishable the conduct of *persons who act independently* and whose rights have not been adjudged according to law'" (quoting from *Regal Knitwear, supra;* emphasis added). In *Heyman,* a federal district court in Connecticut had ordered defendant Robert Kline to execute a quitclaim deed regarding certain Florida property. Both

Kline and his wife, nonparty Jeanne Kline, were residents of Florida. The district court had personal jurisdiction over Robert Kline because the action was based on his alleged breach of an employment contract executed in Connecticut. However, there was no "minimum contacts" personal jurisdiction over Jeanne Kline. The district court nonetheless held Jeanne Kline in contempt for her failure to execute a quitclaim deed, finding that she acted in "active concert or participation" with her husband. The Second Circuit reversed, holding that if Jeanne Kline had a "genuinely independent interest" in refusing to execute the deed, then she had not acted in concert or participated with her husband.[2] As illustrated above, the Secretary and Putnam had "genuinely independent interests" motivating their conduct in this case; thus, they were not in "active concert or participation."

The precedent that most strongly requires a finding of no active concert or participation here is *Thompson v. Freeman,* 648 F.2d 1144 (8th Cir.1981). There, the district court had enjoined the Missouri Department of Social Services from failing to process AFDC applications within forty-five days. After the Missouri agency disobeyed, the court held it in contempt and drafted another injunction. The subsequent injunction required certain actions by the federal Department of Health and Human Services, which theretofore had not been a party. The Eighth Circuit held that the Missouri Department of Social Services and the federal Department of Health and Human Services had not acted in "active concert or participation" as set forth in Rule 65(d). The *Thompson* court stated:

> Although we recognize HHS's past ineffectiveness in securing Missouri's compliance with AFDC regulations, this ineffectiveness does not alone amount to "active concert or participation with" the

---

**2.** The *Heyman* court pointed out that plaintiffs there had an adequate alternative remedy; they could simply sue Jeanne Kline in Florida, where she was amenable to jurisdiction. Here, the members of the nationwide class who live in

Oregon apparently have their interests represented by a parallel lawsuit now pending in Oregon federal court. Surely contempt against Putnam can be had in that action.

state agency within the meaning of Rule 65(d).

648 F.2d at 1148.

The similarity between *Thompson* and the case at bar is striking. As in *Thompson*, the state agency here is alleged to have been the primary wrongdoer or contemnor, with the federal agency being guilty of contempt only in that it failed to secure compliance from the individual state. *Thompson* holds that, at least in the absence of an explicit agreement to disobey, the collective failure by federal and state agencies to implement federal law properly does not constitute "active concert or participation." *Thompson*'s limiting restatement of the permissible scope of injunctions, of course, is rooted in the concerns expressed by the courts in *Alemite* and *Regal Knitwear*. The scope of injunctions cannot be boundless. Especially where the concerted activity alleged is mere failure to act, as in this case and in *Thompson*, courts must be careful not to resort to fictional conspiracies to find personal jurisdiction.

Plaintiffs' able counsel has marshalled an impressive array of case authority designed to persuade that the Secretary and Putnam acted in active concert or participation. Unfortunately for plaintiffs, each of the cases misses the mark. In *Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985), the resident defendant had defrauded the plaintiffs in connection with the sale of securities. The resident defendant then passed the ill-gotten gains on to nonresident defendants, who proceeded to "dissipate" the money. When ordered to show cause why they should not be held in contempt, the nonresident defendants (who had never been parties to the action and who had not been named in the injunction) defended on the ground that there was no personal jurisdictional. The court held that the nonresident, nonparty defendants were "subject to the court's jurisdiction as persons enjoined by the court's order." *Id.* at 715. The Fifth Circuit affirmed:

When [respondents] knowingly participated in [defendant's] scheme to dissipate the funds they equally knowingly subjected themselves to the jurisdiction of that court.

*Id.* at 717.

The *Waffenschmidt* scenario, however, is plainly different from the case at bar. There, the party defendant and the two nonparty respondents clearly worked within a *common scheme* to launder illegally obtained proceeds. Indeed, both the trial court and the court of appeals found by clear and convincing evidence that respondents were aiders and abettors of defendant within the meaning of the federal securities laws. *Id.* at 723–26. Here, there has been no proof of anything resembling aider and abettor liability. Moreover, the whole discussion in *Waffenschmidt* about personal jurisdiction predicated on "active concert or participation" was *dicta* because the court held that respondents were subject to jurisdiction under the traditional "minimum contacts" analysis. *Id.* at 722–23.

*G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29 (1st Cir.1980), also cited by plaintiffs in support of the "active concert or participation" rationale, similarly must be distinguished from the instant case. In *Merriam*, the party defendant and the nonparty respondent were brothers who operated almost identical businesses from adjoining apartments. When the party defendant was enjoined from engaging in a certain type of advertising, the nonparty respondent began engaging in such advertising himself, precipitating the contempt proceedings. The *Merriam* court found that the nonparty respondent was a "managing official" of his enjoined brother's business, and that such a close relationship justified "piercing corporate veils." *Id.* at 39. Of course, no such close relationship between the Secretary and Putnam existed in the present case. *Merriam*, therefore, is of no help to plaintiffs here.

Nor does *Shakman v. Democratic Organization of Cook County*, 533 F.2d 344 (7th Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976), support plaintiffs' "active concert or participation" argument. In *Shakman*, the City of Chica-

go, its "present and future officers, members, agents, servants, employees and attorneys" were enjoined from allowing political activity by city employees to be undertaken on public time and also enjoined "conditioning, basing, or affecting any term or aspect of governmental employment on any political purpose." *Id.* at 346–47. Subsequently, contempt proceedings were brought against the city itself and against the city's Director of Administration of the Department of Streets and Sanitation. After finding that the director's disobedience of the court order came within the course and scope of his employment, the Seventh Circuit affirmed the contempt adjudications. Obviously, the contempt in *Shakman* was based on the director's status as an "employee," not as one in "active concert or participation" with the city. Because there is no employment relationship in the present case, *Shakman* is inapposite.

### IV

Plaintiffs' final argument for finding personal jurisdiction over Putnam is that the Court has the inherent power to protect its ability to render a binding judgment, citing *United States v. Hall*, 472 F.2d 261 (5th Cir.1972). In *Hall*, the trial court had entered an injunction addressed to the public at large, forbidding any persons from interfering with the normal operation of a school in the process of desegregation. Respondent so interfered with the school's operation that, despite the fact that he was neither in privity with nor acting in concert with a party to the litigation, he was held in contempt. Plaintiffs argue that because Putnam has interfered with the Secretary's court-mandated duty to implement the "but for" test, is subject to contempt even if he was not acting in concert with the Secretary.

Plaintiffs would have this Court stretch *Hall* far beyond its actual holding. In *Hall*, the district court's injunction prohibited willful interference with the school's operation. Any person who engaged in such willful interference (including Hall, the eventual contemnor) would necessarily have subjected himself to personal jurisdiction in the state in which the school was located (Florida), whether through the creation of "minimum contacts" or through actual presence. The trial court in *Hall* fashioned its decree so as to make certain that there could be no objection to lack of personal jurisdiction at any contempt hearing. Put simply, *Hall* does not stand for the proposition that a court automatically acquires personal jurisdiction over any person necessary to preserve judgment. Instead, *Hall* legitimates the adjudication of contempt over a nonparty, even one who does not act in active concert or participation with a party, provided that personal jurisdiction over the would-be contemnor *already exists.* As the *Hall* court stated, "[t]he integrity of a court's power to render a binding judgment in a case *over which it has jurisdiction* is at stake in the present case." *Id.* at 265 (emphasis added). If Putnam had subjected himself to jurisdiction in some other way, *Hall* suggests that he could be held in contempt even though he was not a party and even though he did not act in concert or participate with a party. In fact, however, the Court had not already acquired jurisdiction over Putnam in some other way, and the mere fact that contempt over him may be necessary or desirable to help effectuate the judgment does not *create* jurisdiction where it did not previously exist.

There is another reason why *Hall* is inapplicable to the present case. *Hall* arose in the special context of school desegregation. The Fifth Circuit succinctly explained the peculiarities of school desegregation litigation:

As this Court is well aware, school desegregation orders often strongly excite community passions. School orders are, like in rem orders, particularly vulnerable to disruption by an undefinable class of persons who are neither parties nor acting at the instigation of parties. * * * The peculiar problems posed by

school cases have required courts to exercise broad and flexible remedial powers.

*Id.* at 266 (citations omitted). This Court declines plaintiffs' invitation to extend *Hall* beyond its narrow holding.

The foregoing analysis of cases shows clearly why this Court lacks jurisdiction to proceed against Putnam. In the end, plaintiffs must recur to and reexamine the structural limitations of the injunction they secured in this case. The strategy underlying the March 9, 1984, injunction was to obtain compliance from the states *through the efforts of the Secretary.* Pressure on the Secretary, in turn, was to be made available through the threat of contempt. The injunction did not envision direct contempt against the states and their officials. As this Court stated in response to the Secretary's argument that granting the injunction would force the Court to decide how *each* state would implement the "but for" test:

> Although the Court would indeed be reluctant to face such an Augean task, it is not required by this case. * * * If a class member in a state outside California objects to his or her state's implementation of new and correct federal regulations, that matter is for adjudication in the courts of that person's state, *not* here.

*Lynch,* 604 F.Supp. at 39. Upon Oregon's failure to comply, plaintiffs had the option to proceed in federal court in Oregon, or to press for contempt against the Secretary, or both. Why plaintiffs have discontinued their efforts to have the Secretary held in contempt is, of course, not the Court's concern. Suffice it to say, however, that plaintiffs may not have someone other than the Secretary held in contempt simply because it is politically more expedient.

Accordingly, the motion to have respondents Putnam and Reilly held in contempt is denied with prejudice. The motion to have the Secretary held in contempt is denied without prejudice.