**REEBOK INTERNATIONAL LTD. et al., Plaintiffs,**

v.

**Byron McLAUGHLIN et al., Defendants.**

**No. 89–1739–GT (P).**

United States District Court,
S.D. California.

April 27, 1993.

Defendant was not a part of this motion.

Neil A. Smith, Limbach & Limbach, San Francisco, CA, Harley I. Lewin, William M. Reid, G. Roxanne Elings, Lewin & Laytin, P.C., New York City, for plaintiffs.

Matthew E. Digby, Marks & Murase, Los Angeles, CA, for Banque Internationale à Luxembourg.

## ORDER GRANTING MOTION FOR CONTEMPT UPON RECONSIDERATION

GORDON THOMPSON, Jr., District Judge.

On April 26, 1993, at 10:30 a.m., REE-BOK's motion for reconsideration came on for hearing. The hearing was conducted telephonically, and the court stated that it would file this order shortly. The Court has fully considered this matter, including review

of the papers filed by the parties, the authorities cited therein, and the arguments presented.

## BACKGROUND

On May 26, 1992, REEBOK's motion for contempt came on for hearing. Following the hearing, the court issued a written opinion that held that Banque Internationale à Luxembourg (BIL) was not in contempt. The primary basis for this holding was that BIL had been ordered by a Luxembourg court to release the funds. As a result, BIL's action lacked the necessary voluntariness to warrant a finding of contempt. In addition to all of the above, the earlier order made clear that it was not based on any of the papers that were filed late, but that instead these papers would be considered, if at all, in a motion for reconsideration to be heard on August 24, 1992. Because of various discovery matters, the hearing has been continued on several occasions to its present date of April 26, 1993.

Among the evidence that Reebok did not have at the time of the earlier hearing is the declaration from Brigitte McLaughlin. Additionally, Reebok has now obtained some discovery from BIL, and has submitted some of these documents in support of this motion. The totality of this evidence suggests that BIL assisted McLaughlin in the development and execution of a plan to get McLaughlin's money out of BIL. The plan included the creation of Bawnmore Holdings, Inc., and the transfer of funds within BIL so as to create a safe haven. The plan also included the release of $117,000 prior to the Luxembourg order (a portion of which went to BIL for potential legal fees). The plan finally included obtaining an order from the Luxembourg court, in an attempt to provide BIL with a justification for the release of all funds. BIL did not oppose the action for the release of funds or even inform the Luxembourg court of its reasons for not previously releasing the funds. Although Brigitte claims that Byron told her that he had bribed BIL to get some money out, this allegation has not been considered for purposes of this motion.

In what can only be described as incredible testimony, Jean–Jacques Rommes, the head of the litigation department of BIL, denies each of the allegations, and restates that BIL did nothing more than obey the commands of the Luxembourg court order.

## DISCUSSION

### A. *Preliminary Defenses*

■ Some preliminary matters persist from the earlier hearing. Specifically, three defenses raised by BIL were not addressed at the May 1992 hearing because the ruling was in BIL's favor. These defenses were based on lack of personal jurisdiction and on the consent judgment. Reebok erroneously argues that BIL should not be able to reassert these defenses; these issues, however, were not ruled on at the prior hearing. As a result, BIL may appropriately raise these issues, although, as the following discussion indicates, the review of these issues does not effect the outcome of these proceedings.

BIL also raises for the first time an argument related to good faith actions based on advice of counsel. Unlike the personal jurisdiction and consent judgment issues, the advice of counsel argument is not appropriately raised at this time.

1. Release and/or Res Judicata as a result of settlement

■ BIL argues that the settlement agreement of May 17, 1992 and the consent judgment entered on October 28, 1991 bar this action under res judicata principles, and in the alternative Reebok has released BIL of any claims it might have against it. Reebok, however, has shown that Byron McLaughlin has materially breached the settlement agreement by failing to pay any portion of the settlement amount. As such, the court will set aside the final judgment entered on October 28, 1991. With the final judgment set aside, the arguments of release and res judicata cannot bar this litigation.

Moreover, res judicata and release are not defenses that BIL may raise in the present situation. Instead, these are defenses that can only be raised by Byron McLaughlin. Byron McLaughlin, however, chose not to raise either of these defenses (thereby waiving them), and was found in contempt by this

court at the May hearing based on his non-opposition. As BIL's rights, if any, under the settlement agreement would emanate from Byron McLaughlin's rights, BIL likewise forfeited those rights, and since BIL was not a party to the agreement, BIL has no complaint as a consequence.

### 2. Personal Jurisdiction [1]

■ Under a traditional analysis, personal jurisdiction, if it exists at all, arises out of specific jurisdiction, as clearly there is no general jurisdiction over BIL. Such an analysis would require application of the traditional *International Shoe* analysis as it has been developed. Applying such a standard, BIL's contacts with this jurisdiction, assuming all allegations are proven, do warrant the assertion of personal jurisdiction. It does not go unnoticed that BIL purposefully entered into a banking agreement with Byron McLaughlin and then engaged in numerous conversations. Although it would not be appropriate to say that BIL does business in California, or in the United States for that matter, BIL does accept money from citizens of this country and of this state. The essential contact, however, relates to the allegations of assisting McLaughlin in his efforts to release the funds held at BIL. By providing such assistance, BIL engaged in activity outside of California "that would have the foreseeable and intended result of dissipating assets subject to marshalling in that forum." *Waffenschmidt v. MacKay,* 763 F.2d 711, 723 (5th Cir.1985). In essence, to the extent that minimum contacts are required, personal jurisdiction over a non-party in a case such as this one may found by construing the non-party's act of assisting in the violation of an injunction as a "super-contact."

■ Under a very similar theory, an alternative analysis has developed in cases of contempt under Rule 65. Separate and apart from the traditional contacts analysis, these cases hold that a court may have personal jurisdiction over a non-party based on the court's inherent authority to enforce its own orders. *See Waffenschmidt v. MacKay,* 763 F.2d 711, 721 (5th Cir.1985); *N.Y. State National Organization for Women v. Terry,* 732 F.Supp. 388, 399–400 (S.D.N.Y.1990). Alternatively stated, given BIL's knowledge of this court's Order, BIL must have foreseen litigation in this jurisdiction as a result of a violation of that Order. Such foreseeable litigation does not offend traditional notions of fair play and substantial justice. *Waffenschmidt,* 763 F.2d at 721. To quote the Southern District of New York: "Respondents' brash assertion that they should be allowed to act in concert with defendants in order to intentionally violate a court order of which they had actual notice, while retaining impunity from the imposition of coercive sanctions fashioned to assure compliance with the order, is as groundless as it is insolent." *N.Y. State National Organization for Women v. Terry,* 732 F.Supp. 388, 400 n. 5 (S.D.N.Y.1990).

Finally, *Lynch v. Rank,* 639 F.Supp. 69 (N.D.Cal.1985), is of no assistance to BIL. BIL's belief, even if found to be true, that it was not acting in violation of the restraining order is irrelevant. *Lynch* did not state the rule that a plaintiff must prove that a non-party had the "motive" to assist in the violation of an injunctive order. Instead, *Lynch* held that where a non-party was acting completely independently of the party, assertion of jurisdiction over the non-party would be inappropriate. BIL's insistence that it was merely conducting business as usual would not avail it of the exception in *Lynch* as it would not rise to the level of "independent" conduct described in *Lynch.* To the contrary, if Reebok's allegations stand up (and they do), BIL did assist Byron McLaughlin in violating this court's order. As a result, BIL is subject to this court's jurisdiction—litigation that it must have foreseen.

### 3. Advice of Counsel

Reebok properly objects to BIL's assertion of an advice of counsel defense. This de-

---

1. The determination of personal jurisdiction in case such as this one revolves around findings on the merits of the motion itself. The basis of personal jurisdiction, if it exists, evolves out of the allegations that make out the contempt. As the discussion will indicate, the finding of contempt will be the most significant factor (and in some cases the only factor) justifying the finding of personal jurisdiction. As a result, because of the intertwined nature of personal jurisdiction and the merits, non-parties may not raise issues of lack of personal jurisdiction to avoid an inquiry into the merits.

fense had not properly been raised earlier and thus is deemed waived.

### B. *No Review Will Be Made of the Earlier Legal Conclusions*

A significant amount of the briefing for reconsideration addressed the legal issues raised in the May 28, 1992 order. Particularly, there was continued debate over the applicability and non-applicability of the "exequatur" procedure. There is no reason, however, to reconsider the earlier analysis of the "exequatur" procedure under the Luxembourg law. Importantly, the issue is irrelevant. Even if the exequatur procedure was not available to Reebok as a means of securing the freezing of the funds at BIL, the fact would still remain that the order of the Luxembourg court would still be in effect, and BIL would still have had an obligation to comply with the order. *The discussion of the exequatur in the previous order was not critical to the ultimate holding,* but merely added additional support for why respect for the Luxembourg order warranted not finding BIL in contempt. Even without this additional support, and even had Reebok done everything in its power to secure the monies (accepting Reebok's argument regarding the exequatur), the previous facts would not justify a finding of contempt.

### C. *Legal Standard for Finding A Non-Party in Contempt*

█ With respect to non-parties, Rule 65(d) of the Federal Rules of Civil Procedure provides in pertinent part that an order granting an injunction "is binding ... upon those persons in active concert or participation with [the parties] who receive actual notice of the order...." Fed.R.Civ.P. 65(d). As explained by Judge Learned Hand, "the only occasion when a person *not a party* may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has the power to forbid, the act of the party. This means the respondent must either abet the defendant, or must be legally identified with him...." *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir.1930). Although Judge Hand sought to place the outer limits on finding non-parties in contempt, it is clear that a non-party may be bound by an injunction where it is proven that the non-party "participated in the contumacious act" of the party. *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.,* 639 F.2d 29, 35 (1st Cir.1980).

### D. *New Evidence, and Its Relation to Contempt*

Reebok has presented new evidence [2] in support of this motion for reconsideration. The earlier order on the contempt issue was based on the perception that BIL was stuck between a rock and a hard spot—subject to inconsistent orders from two competing tribunals (the Luxembourg court and this court). Continuing to recognize the validity of the earlier order, there would be two

---

**2.** Contrary to BIL's initial opposition to the motion for reconsideration, Reebok made a sufficient showing that it did not have the "new" evidence in its possession prior to the earlier filing deadlines, and that it made adequate efforts to secure the evidence. Brigitte McLaughlin was in France, and apparently somewhat reluctant to provide the information requested by Reebok. Despite BIL's allegations of the cozy relationship between Reebok and Brigitte, the fact remains that Brigitte did not sign the declaration until after the latest filing deadline for the May hearing. Moreover, Reebok's attempt to get these papers before the court prior to the hearing date, albeit after the filing deadline, belies the suggestion that Reebok was following a tactical strategy, and having lost wants to try a different one. Thus the new evidence should be considered.

Additionally, Reebok did not have access to discovery at the time of the May 1992 hearing, so clearly all of this evidence is new evidence and appropriately considered as a basis for reconsideration.

Although the new evidence as whole will be considered, it should be noted that Brigitte's allegation that Byron told her he had bribed someone at the bank to get the monies released *is not considered for purposes of this motion.* The statement is an out of court statement offered for the truth of the matter asserted, namely that BIL's conduct was not innocent. As a result, the statement is hearsay, and therefore inadmissible.

The remaining evidence, however, has not been objected to and is admissible.

situations which could give rise to a finding of contempt: (1) that BIL's banking conduct prior to the Luxembourg order should result in a finding of contempt with respect to portions of the released funds or (2) that BIL's participation in obtaining the Luxembourg order justifies a finding of contempt with respect to all of the released funds. In the present context, "comity" is no longer of any relevance. Instead, the question turns from its prior emphasis on the impact of the order issued by the Luxembourg court (which has been resolved in BIL's favor) to the current emphasis on BIL's conduct prior to the Luxembourg court order.

### 1. BIL's banking conduct prior to the Luxembourg Order

At the earlier hearing, BIL acknowledged that it had transferred money from McLaughlin's Heatherdale Account to another account in Brigitte's name and then to another account, the Bawnmore Account, which ultimately was controlled by Byron McLaughlin. The May 1992 Order accepted the innocent explanation of these transfers, reasoning that the compromise BIL worked out with McLaughlin acted to keep the money at BIL. Although the court did not make a finding of contempt in the May 1992 Order, these transfers were technical violations of the restraining order—the assets of McLaughlin were not to be transferred. The court is now of the opinion that these violations should not be viewed merely as a technical violation. In not finding contempt previously, the court accepted as a factual matter the explanation that BIL was attempting to appease an irate customer and truly desired to keep the money at the bank. There is, however, a second explanation, namely that the money was moved in an effort hide the money from Reebok. Based on all of the evidence now before the court, the court finds that BIL's motive was to assist McLaughlin in hiding the funds that were originally in the Heatherdale Account. Importantly, such motive is not necessary for a finding of contempt—but the presence of such motive prevents the court from overlooking what was previously considered merely a technical violation. The significant facts include that Reebok already knew of the Heatherdale Account; the Heatherdale Account was included as a specific account to be frozen in the restraining order. The Heatherdale Account having already been identified, McLaughlin felt it was necessary to remove the funds from that account as soon as possible. Although McLaughlin may have preferred withdrawing the money from BIL entirely, McLaughlin knew, as did BIL, that the transfer of funds into another account at BIL would provide additional time to withdraw the money later, if not permanently safeguarding the funds. Had Reebok been able to attach the meager sums remaining in the Heatherdale Account, it is readily foreseeable that BIL would have, just as it did in this motion, refused to provide information about where the funds had been transferred. BIL would have put its metaphorical hands in the air and either said (1) that it did not know where the funds went or (2) that banking secrecy regulations forbade the release of such information. Viewed in light of this second explanation, the moving of funds (even within BIL) is no longer merely a technical violation. It is a blatant violation of the court's prior order that assets not be transferred, creating at least a temporary safe haven for the funds in the event that BIL was ordered to release monies in the Heatherdale Account.

Moreover, it is not insignificant that BIL prepared all of the paperwork related to the transfer of funds into the account of Brigitte McLaughlin and that BIL also aided McLaughlin in forming and setting up the Bawnmore Corporation. With respect to the corporation, BIL presented Brigitte with a list of titles to choose from, and after she selected "Bawnmore," BIL again prepared the necessary documents to form the corporation and then to transfer funds into this account. It is undisputed that BIL was a conduit in this scheme, allowing its banking facilities to be used to illegally transfer funds. Indeed, as the court alluded in the May 1992 Order, absent the specific directive of the Luxembourg court, BIL's mere participation in carrying out McLaughlin's requests is sufficient to justify a finding of contempt. *See, e.g., South Central Bell Telephone Co. v. Constant, Inc.,* 304 F.Supp. 732,

735–36 (E.D.La.1969), *aff'd,* 437 F.2d 1207 (5th Cir.1971) (in dicta, court held that non-party telephone company could be found in contempt when it had the means to prevent its equipment from being used in violation of the injunction—failure to use such means would result in passive participation in the violation). Even beyond such passive participation, however, the court finds that BIL actually assisted McLaughlin in creating and devising a scheme that would allow McLaughlin to get around the court order while minimizing the risk that BIL was exposed to.

Unrelated to the above, BIL now admits that it transferred approximately $117,000 out of BIL prior to the Luxembourg Order. BIL's only defenses for this conduct are that the transfer was pursuant to the compromise agreement with McLaughlin and that BIL was able to preserve the principal amount (i.e., the money transferred was interest or could be replaced by future interest). Neither of these arguments excuse BIL's conduct. The restraining order from this court was not limited to principal, but referred to assets, and thus would encompass interest accrued on those assets. The compromise agreement may have been an effort by BIL to appease the irate McLaughlin, but the fact remains that the transfer did precisely what the court said BIL could not do in the May 1992 order: transfer funds at the request of McLaughlin, as opposed to at the direction of the Luxembourg court. As a result, BIL can be and should be found in contempt for this transfer.

■ To restate the most important issues, a finding of contempt requires clear and convincing evidence. In this regard, BIL should be found in contempt for transferring assets within BIL from one account to another and BIL should be found in contempt for releasing the $117,000 it refers to simply as interest. Moreover, it is no defense, as BIL would have the court believe, that BIL was simply following the normal and customary practices for Luxembourg banks. This argument is so incredibly non-meritorious it need not even be discussed. BIL wants the court to believe that because BIL was following normal and customary practices, it was not

assisting McLaughlin, but instead was acting in its own interest. If BIL's view of the law on this issue were adopted, no bank could ever violate a court order to freeze assets. Here, the restraining order was specifically designed to freeze McLaughlin's assets. If this meant nothing else, it meant that McLaughlin was not to withdraw any money that he had in any account. Given the existence of the order, BIL (and for that matter any other bank with notice of the order) should have ceased to follow normal banking practices when it came to the assets of Byron McLaughlin.

2. **BIL's participation in obtaining the Luxembourg Order**

■ The evidence related to BIL's participation in the efforts to obtain the Luxembourg Order is less clear, but is likewise sufficient to support a finding of contempt. Importantly, the court's previous conclusions on BIL's motives impact the court's findings related to BIL's involvement with the Luxembourg order. Viewed in light of the totality of circumstances, it becomes more and more clear that BIL was attempting to do everything it possibly could to assist McLaughlin in his effort to get the funds out of BIL, while attempting at the same time to minimize its own potential liability.

On February 23, 1990, Mr. Kinsch, lawyer for McLaughlin, wrote to McLaughlin regarding the upcoming lawsuit in Luxembourg: "As to the suit that HEATHER-DALE was to bring against the Bank, Mr. Rommes agrees to it." In the April 14, 1990 letter from McLaughlin to BIL is the following sentence: "After four and a half months of waiting patiently and going through *all the requests of yourself and the bank* and in the end getting a jurisdictional court order allowing the bank no risk ..." Again, there is the possibility of two conclusions being drawn from these facts: (1) that BIL tried to fend off an irate McLaughlin by telling him that he would have to get a court order before the funds would be released or (2) that BIL suggested McLaughlin proceed to a Luxembourg court as a way of allowing the release of funds while minimizing BIL's liability. Viewed in light of all of the evidence, the

court finds that BIL suggested McLaughlin proceed to the Luxembourg court. Again, BIL no longer stands merely as an innocent bystander. It clearly violated the restraining order when it transferred the $117,000 prior to the Luxembourg Order; it also clearly violated the restraining order when it allowed the movement of funds within BIL. All of BIL's conduct points to one simple conclusion—that BIL was doing everything that it could to ensure the release of funds, all the time while trying to minimize its own liability. And in doing everything that it could to ensure the release of funds, BIL violated the restraining order.

Moreover, Mr. Rommes admits that there was no written reply to the Heatherdale action. Although the court has discredited much of Mr. Rommes testimony, it does appear that there was no opposition to the Heatherdale action. The Luxembourg court can decide for itself whether there has been a fraud committed on that court, but it would appear to the court that BIL (by remaining silent) allowed McLaughlin to convince the Luxembourg court that the order to release funds was appropriate. Drawing from the reasoning of *South Central Bell Telephone Co. v. Constant, Inc.*, 304 F.Supp. 732, 735–36 (E.D.La.1969), *aff'd,* 437 F.2d 1207 (5th Cir. 1971), BIL should have taken steps to prevent its banking facilities from being used in violation of the restraining order. In the present instance, BIL should have, at a minimum, informed the Luxembourg court of the United States order—BIL's reason for not releasing the funds in the first place—and given the Luxembourg court the opportunity to order the release of the funds with full knowledge of the facts. Instead, BIL remained silent so that an order would be entered requiring the release of the funds. Such conduct assisted McLaughlin in removing all of the funds held at BIL. Such conduct also eliminates the element of good faith that excused BIL's reliance on the Luxembourg order.

Unquestionably, it would be preferable prior to making a finding of contempt that the court be presented with the proverbial smoking gun—a piece of evidence that demonstrates unequivocally BIL's active involvement in the orchestration of this scheme. The absence of such a damning piece of evidence, however, does not warrant ignoring the evidence that is before the court, evidence that points again and again to the factual finding that BIL, albeit in as unobtrusive a way as possible, continually did everything it could to ensure that McLaughlin was able to remove his funds from the bank. As a result, BIL is appropriately held in contempt for having aided and abetted McLaughlin in removing all of the funds from BIL.

### 3. Sanctions for Contempt

At no point do the voluminous papers presented in support of this motion address the issue of the proper sanctions for a finding of contempt. As a result, the hearing on the issue of the proper sanctions based on the court's finding of contempt is set for June 14, 1993 at 10:30 a.m.

Reebok's moving papers will be due on May 17, 1993;

BIL's papers will be due on June 1, 1993;

any reply will be due on June 7, 1993. The moving papers and the opposing papers shall not be more than 15 pages and the reply shall not be more than 7 pages. Moreover, parties are specifically directed to refrain from rearguing any of the issues addressed by the court in this order, and to limit their arguments to the proper sanction.

### CONCLUSION

IT IS HEREBY ORDERED that the final judgment is set aside.

IT IS HEREBY FURTHER ORDERED that BIL's defense of *res judicata* and release are not persuasive because the final judgment has been set aside and because these defenses were waived when they were not raised by Byron McLaughlin.

IT IS HEREBY FURTHER ORDERED that non-party BIL may not raise the issue lack of personal jurisdiction to avoid an inquiry into the merits. Moreover, the court's finding of contempt provides the court with personal jurisdiction over a non-party who had notice of the prior order and who was assisting the party violate that order.

IT IS HEREBY FURTHER ORDERED that any attempt by BIL to assert a defense based on the advice of counsel is not timely and is deemed waived.

IT IS HEREBY FURTHER ORDERED that the earlier "legal" rulings of the court will not be reconsidered. "Factual" rulings, however, have been reconsidered.

IT IS HEREBY FURTHER ORDERED that the court finds BIL in contempt. BIL violated the injunction by assisting in the transfer of funds out of the Heatherdale, even though the funds did not leave BIL. BIL violated the injunction by assisting in the transfer of $117,000 out of BIL prior to the Luxembourg order. Finally, BIL violated the injunction by assisting McLaughlin in obtaining the Luxembourg order.

IT IS HEREBY FURTHER ORDERED that a motion on the proper sanctions as a result of the contempt will be heard on June 14, 1993 at 10:30 a.m.

**IT IS SO ORDERED.**